BAUER, Circuit Judge.
Plaintiff-appellant, Michael Dunderdale (“Dunderdale”), filed a discrimination action against defendant-appellee, United Airlines, Inc. (“United”), under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., (“ADA”), for failure to accommodate. The district court granted summary judgment in favor of United, and Dunderdale appealed. For the reasons that follow, we affirm the district court’s ruling.
I. BACKGROUND
Dunderdale began working for United in April 1997 as a ramp serviceman at O’Hare International Airport. The Collective Bargaining Agreement (“CBA”) between United and the International Association of Machinists and Aerospace Workers (the “Union”) governs the terms and conditions of employment as a United ramp serviceman. Ramp servicemen bid for placement to different work areas throughout United. Once ramp servicemen bid on their desired work areas, the CBA requires United to place them according to their seniority.
United has a written job description that applies to all ramp servicemen, regardless of their work area. The “Job Functions” of a ramp serviceman are:
Load[s], stows, unloads mail, cargo and baggage from conveyor belts, carts; trucks and aircraft. Cleans; services aircraft interiors and removes, assembles and installs passenger cabin supplies. Loads unloads buffet and food supplies. Performs aircraft service duties including cleaning windshields, engine oil checks/servicing and deicing functions. Receives positions and dispatches aircraft. Operates and cleans various mechanical machines and ramp equipment related to aircraft services such as radios, aircraft air conditioners, cargo and belt loaders, fork lifts, trucks, tractors, vans and related automotive equipment. Operates computers and printers to enter, access and manage aircraft load manifest data and instructions, color-coded baggage/transfer systems, aircraft fueling or other service information.
The written job description also states that a ramp service-man’s duties involve *852 “pulling, pushing of carts and containers; performs duties in walking, standing, bending, kneeling and stooping positions; lifts freight, baggage and other heavy-items — up to 70 pounds.”
In December 2002, Dunderdale injured his back at work. Due to his injuries, he did not return to work until February 2004. At that time he did not have any work restrictions, but two weeks after he returned, he injured his back again. As a result, Dunderdale went on leave until June 2005. When he returned, he had several permanent work restrictions. He could not lift more than 30 pounds, he was unable to drive United’s vehicles, and he could not bend, stoop, or kneel.
Because of Dunderdale’s work restrictions, United assigned him to the Matrix position. At that time, the Matrix- position was part of the Product Sort work area. It involves sitting at a computer next to a conveyor belt, scanning the tags on luggage coming down the conveyor belt, and then processing the scans on the computer. In 2005, United’s policy was that all ramp servicemen with permanent work restrictions could bid for positions in the Product Sort work area, and then United would assign them to the Matrix position.
In 2007, United decided to separate the Matrix position from the Product Sort work area. As a result, ramp servicemen had to specifically bid for the Matrix position. But, the position was only available to ramp servicemen with permanent work restrictions.
In 2010, United decided to change the bidding policy regarding the Matrix position. Starting in May 2011, all ramp servicemen could bid for the Matrix position, not just those with permanent work restrictions. Debra DiSantis (“DiSantis”), United’s Manager of Performance and Labor, recommended the change. DiSantis stated that the “overarching” reason for the change was to “improve the [bidding] system” by having the Matrix position match the language of the CBA regarding work area placement based on seniority, thereby creating “clear, concise guidelines and directions on the process and policy [of the bidding system].” Although no one had filed a formal grievance prior to this decision, DiSantis was notified by the Union that other ramp servicemen had questioned their inability to bid for the Matrix position.
On April 21, 2011, Sheila Siggal (“Sig-gal”), United’s Supervisor for Performance and Labor Relations, met with Dunder-dale. Siggal informed Dunderdale that he no longer had sufficient seniority to retain his position at the Matrix since all ramp servicemen could bid on the position beginning May 2011. As a result, Siggal stated that effective May 2011, United would place Dunderdale on Extended Illness Status (“EIS”). While on EIS, Dunderdale would continue to receive various benefits as a United employee, such as health insurance and access to United’s intranet, Skynet, for up to three years. United employees can use Skynet to search and apply for open positions at United.
During the April 21, 2011, meeting, Dun-derdale told Siggal that he believed he was able to perform the positions of the Auditor, Bulls-eye, and the Manpower Office. All three are no-bid positions, which means that they are not open for bidding, nor are they placed based on seniority. However, Siggal informed Dunderdale that there were no open positions for the Auditor, Bulls-eye, or the Manpower Office.
In May 2011, Dunderdale went on EIS. While on EIS, he did not apply for any other position at United. On August 24, 2011, and on November 22, 2011, United sent Dunderdale letters inviting him to participate in Reasonable Accommodation *853 Process (“RAP”) sessions. Dunderdale failed to respond to both letters and did not participate in either proposed RAP session.
In October 2011, Dunderdale met with a human resources manager at United because he believed that United had discriminated against him. During this meeting, Dunderdale requested appointment to a no-bid position, but the request was denied.
On June 7, 2012, Dunderdale filed suit against United for discrimination and retaliation under the ADA. On April 15, 2013, Dunderdale had a RAP session with representatives of United and the Union. At this meeting, Dunderdale again requested appointment to a no-bid position, but was again denied. Apart from these two requests, Dunderdale did not seek any other accommodation from United while he was on EIS.
On September 26, 2013, United informed Dunderdale that he had sufficient seniority to regain the Matrix position. Dunderdale returned to work in October 2013 in the Matrix position. On October 18, 2013, United moved for summary judgment on Dunderdale’s discrimination and retaliation claims. In response, Dunderdale waived his retaliation claim and instead focused solely on whether United discriminated against him by failing to reasonably accommodate his disability. On August 4, 2014, the district court granted summary judgment in favor of United. Dunderdale appealed.
II. DISCUSSION
The issue before this court is whether it was appropriate to grant summary judgment in favor of United on Dunderdale’s ADA claim for failure to accommodate. Summary judgment is appropriate if there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). We review the district court’s ruling de novo, and examine the record in the light most favorable to the non-moving party. Kotwica v. Rose Packing Co., Inc., 637 F.3d 744, 747 (7th Cir.2011) (citations omitted).
In order to establish a prima facie ADA claim for failure to accommodate, a plaintiff must establish that: (1) the plaintiff is a qualified individual with a disability; (2) the employer was aware of the disability; and (3) the employer failed to reasonably accommodate the plaintiffs disability. James v. Hyatt Regency Chicago, 707 F.3d 775, 782 (7th Cir.2013) (citation and quotation omitted); see also 42 U.S.C. § 12112(b)(5)(A).
United admits Dunderdale was disabled and that it was aware of his disability, so the two issues before the court are: was Dunderdale a “qualified individual” with a disability, and did United-fail to reasonably accommodate his disability.
A. Whether Dunderdale was a Qualified Individual with a Disability
The ADA defines a “qualified individual” as “an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.” 42 U.S.C. § 12111(8) (emphasis added). To determine what constitutes an essential function of the position, courts consider “the employer’s judgment,” as well as a “written job description” of the position. Id. Also, the United States Equal Employment Opportunity Commission (“EEOC”) regulations provide that the essential functions are the “fundamental job duties” of a position, rather than the position’s “marginal functions,” and that courts should examine *854 several factors to determine essential functions.[1] 29 C.F.R. § 1630.2(n)(l)-(3).
In this case, lifting more than '70 pounds was an essential function of the ramp serviceman position. United’s written job description for ramp servicemen expressly states the lifting requirement, as well as illustrates how heavy lifting is a fundamental duty of the position. For example, it lists that ramp servicemen are expected to load and unload mail, cargo, baggage, freight, cabin, supplies, buffet supplies, and food supplies, all of which may weigh up to 70 pounds. Thus, Dunderdale’s inability to lift more than 30 pounds prevented him from performing the essential functions of the ramp serviceman position without a reasonable accommodation.
However, Dunderdale could perform the essential functions of the ramp serviceman position with a reasonable accommodation. After Dunderdale was injured in 2005, United transferred him to the Matrix position. He successfully held this position for over five years and only lost it due to the change in United’s bidding policy, rather than any inability to perform the position’s tasks. Thus, Dunderdale was able to perform the essential functions of a ramp serviceman with a reasonable accommodation. See Mobley v. Allstate Ins. Co., 531 F.3d 539, 545 (7th Cir.2008) (plaintiff could perform essential functions with a reasonable accommodation because she successfully met her performance standards when given an accommodation).
As a result, Dunderdale established he was a qualified individual with a disability. The key issue, then, is whether United failed to reasonably accommodate his disability.
B. Whether United Failed to Reasonably Accommodate Dunder-dale’s Disability
Dunderdale argues that United failed to reasonably accommodate his disability because: (1) United did not allow him to remain in the Matrix position; and (2) United did not assign him to one of the no-bid positions for which he believed he was qualified.
1. The Matrix Position
Dunderdale claims United accommodated his disability from 2005 through 2011 by placing him in the Matrix position, but ceased accommodating him in May 2011 when he was removed from the position. We hold that United did not have to maintain Dunderdale in the Matrix position after May 2011 because it would have violated United’s seniority system.
In US Airways, Inc. v. Barnett, the United States Supreme Court held that it is unreasonable to assign an employee to a position as an accommodation if doing so would violate the employer’s seniority system. 535 U.S. 391, 403, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002). The Court reasoned that, “to require the typical employer to show more than the existence of a seniority system might well undermine the employees’ expectations of consistent, uniform treatment — expectations upon which the seniority system’s benefits depend.” Id. at 404, 122 S.Ct. 1516. The Court noted, however, that an employee may demonstrate that “special circumstances” exist that justify assigning an individual to *855 a position even if it violates the employer’s seniority system. Id. at 405, 122 S.Ct. 1516.
In this case, both parties agree that United’s CBA established a seniority system for bidding on ramp servicemen work areas, and that in May 2011, the Matrix position became subject to the seniority bidding system. Dunderdale lost his position because he did not have sufficient seniority; maintaining Dunderdale in the Matrix position after May 2011 would have violated United’s seniority system.
In response, Dunderdale provides two arguments for why these facts should constitute “special circumstances” warranting the exception to the Barnett holding.
First, he argues that since United previously restricted the Matrix position for ramp servicemen with permanent work restrictions, it would not be “unduly burdensome” to maintain the status quo. This does not warrant the “special circumstances” exception. In Barnett, the Court found that special circumstances exist when the facts show that the employer does not maintain a consistent and uniform seniority system on which employees rely. See Barnett, 535 U.S. at 405, 122 S.Ct. 1516. The Court gave two examples illustrating when this may occur: when an employer unilaterally and frequently changes the seniority system such that there is no reasonable expectation among the employees that the system will be followed; or where a seniority system contains significant exceptions such that an additional exception is “unlikely to matter.” Id. Neither of these apply here.
We initially note that there is no evidence of global disregard for the seniority system at United, nor is there a record that United regularly ignored Union complaints that the Matrix position should be subject to bidding during that time period. Instead, the company was consistent in its policy of using the Matrix position to accommodate certain employees with disabilities during that time. Only when members of the Union began to question their inability to bid for the position did United decide that it should strictly adhere to the terms of the CBA. There is no evidence that this decision was a pretext for disability discrimination. Disabled employees remained able to bid for the Matrix position on the basis of seniority. Neither the decision to accommodate disabled employees in the Matrix position, nor the later decision to strictly adhere to the CBA, affected employee expectations in the manner contemplated by the Supreme Court in Barnett.
Prior to May 2011, the Matrix position was not open to United’s seniority bidding system for all ramp servicemen. Therefore, the fact that United previously accommodated Dunderdale before May 2011 by restricting the Matrix position for ramp servicemen with permanent work restrictions does not affect the other ramp servicemen’s reliance on the bidding system. Once United opened the Matrix position to the seniority bidding system, all of the ramp servicemen received an expectation of unilateral, consistent treatment regarding bidding for that position. In fact, Dun-derdale himself benefitted from that unilateral and consistent treatment because he bid back into the Matrix position once he reclaimed seniority in September 2013. His argument fails.
Second, Dunderdale argues that this case presents “special circumstances” because United changed the bidding system for the Matrix position without anyone first filing a formal grievance. However, employers do not have to maintain positions or job structures that provide reasonable accommodations if the employer finds, for legitimate business reasons, that the *856 position or job structure should be eliminated. See Gratzl v. Office of the Chief Judges of the 12th, 18th, 19th, and 22nd Judicial Circuits, 601 F.3d 674, 680 (7th Cir.2010). Here, United decided to change the structure of the Matrix position’s bidding system so that it would conform to the seniority bidding system language of the CBA. Increasing reliability and consistent application of the seniority bidding system is a legitimate business purpose. We will not second-guess United’s decision merely because Dunderdale believes United should have waited for a formal grievance filing. See Ptasznik v. St. Joseph Hospital, 464 F.3d 691, 697 (7th Cir.2006) (“Federal courts have authority to correct an adverse employment action only where the employer’s decision is unlawful, and not merely when the adverse action is unwise or even unfair.”).
2. The No-Bid Positions
Dunderdale also argues that he was qualified to perform several no-bid positions despite his work restrictions: Auditor, Bulls-eye, Safety, and the Manpower Office. Further, because they were no-bid positions, Dunderdale argues United could have assigned him to them without violating the seniority bidding system. Since United failed to assign him to any of the positions, Dunderdale claims United failed to provide him with a reasonable accommodation.
The fatal flaw in Dunderdale’s argument, as the district court correctly found, is that he failed to establish that any vacancies existed in those positions. Under the ADA, while an employer may have to assign an employee to a different position as a reasonable accommodation, this duty extends “only to vacant positions; an employer is not required to ‘bump’ other employees to create a vacancy so as to be able to reassign the disabled employee.” Gile v. United Airlines, Inc., 95 F.3d 492, 499 (7th Cir.1996) (emphasis added) (citation omitted); see also Stern v. St. Anthony’s Health Center, 788 F.3d 276, 291 (7th Cir.2015) (“Although the ADA requires an employer to consider reassigning a disabled employee ... the employer’s reassignment obligation is nonetheless limited to vacant positions.”) (emphasis in original) (citation omitted). It is the employee’s burden to demonstrate that a vacant position exists. Jackson v. City of Chicago, 414 F.3d 806, 813 (7th Cir.2005) (citations omitted).
Dunderdale argues vacant positions were available because all of the no-bid positions he identified “changed hands” while he was on EIS. Specifically, during the nearly two years that Dunderdale was on EIS, the Auditor position was filled by two new ramp servicemen, the Bulls-eye position was filled by two new ramp servicemen, the Safety position was filled by two new ramp servicemen, and the Manpower Office position was filled by one new ramp serviceman. Thus, Dunderdale claims this evidence satisfies his burden to demonstrate that a vacant no-bid position existed.
We disagree. This court has previously found that the employee must demonstrate that a vacant position exists at the time of the adverse employment decision. See McCreary v. Libbey-Owens-Ford Co., 132 F.3d 1159, 1165 (7th Cir.1997) (“[the employee] needed to show that a vacant position in quality control was available at the time [the employer] fired him.”) (citation omitted). Under McCreary, the no-bid positions had to be vacant on April 21, 2011, when United informed Dunderdale that he had insufficient seniority to retain the Matrix position and would be placed on EIS. At that meeting, Siggal informed Dunder-dale that there were no vacancies in any of the identified no-bid positions. In addi *857 tion, there is also precedent suggesting that the employee has to identify that a vacant position exists at the time the employee requests reassignment to that position. See Rehling v. City of Chicago, 207 F.3d 1009, 1014-15 (7th Cir.2000) (finding the employee failed to produce sufficient evidence that a vacancy in the desired position existed at the time the employee requested reassignment). Here, Dunder-dale made two additional requests for assignment to a no-bid position in October 2011 and in April 2013. But, again, he presented no evidence that there were any vacancies available at the time of either request.[2]
Dunderdale relies on Johns v. Laidlaw Education Services, 199 Fed.Appx. 568 (7th Cir.2006), to argue that the fact that the positions changed hands satisfies his burden to show that a vacancy existed. However, there are two problems with Dunderdale’s reliance on Johns. First, it is an unpublished order issued before January 1, 2007, it is not a precedential decision, and should not have been cited. 7th Cir. R. 32.1. Second, Johns is factually distinguishable. The employee in that case, a bus driver on light duty due to an injury, received a letter from her employer stating that she no longer qualified for light duty and instead “will be assigned as a [bus] monitor ... until driving routes were available.” Johns, 199 Fed.Appx. at 569-70 (quotation omitted). On appeal, the employee argued the employer should have assigned her to the bus monitor position. Id. at 570. The court found the employee satisfied her burden to show there was a vacancy because the letter stated that since there were no bus routes available, the employer will assign the employee to the bus monitor .position; inferring that the bus monitor position was available at that time. Id. at 570-71. By contrast, Dunderdale fails to present any evidence indicating that there was a vacant no-bid position available when he was removed from the Matrix position, or when he made his two requests for reassignment to a no-bid position while he was on EIS.
In addition, it is undisputed that Dun-derdale failed to apply for any other position with United while he was on EIS. Other than repeating his request for a no-bid position in October 2011 and April 2013, he made no effort to obtain any other reasonable accommodation, and even refused to participate in the proposed RAP sessions on August 24, 2011, and November 22, 2011. Furthermore, it was Dun-derdale’s duty to search Skynet for job openings while he was receiving benefits on EIS, and his failure to do so does not establish that United failed to reasonably accommodate his disability. See Weiler v. Household Finance Corp., 101 F.3d 519, 526 (7th Cir.1996) (employer reasonably accommodated employee by granting her requested time off work, short-term disability benefits, extended leave, and allowed her to use company’s “posting” procedure to apply for available positions).

t

III. CONCLUSION
For the foregoing reasons, the ruling of the district court is AFFIRMED.

. Specifically, the EEOC regulations list: (i) the employer’s judgment; (ii) written job descriptions; (iii) amount of time spent performing the function; (iv) consequences of not requiring the employee to perform the function; (v) terms of a collective bargaining agreement; (vi) work experience of prior employees in the position; and (vii) current work experience of employees in similar jobs. 29 C.F.R. § 1630.2(n)(3).

. United also claims that Dunderdale was not qualified for any of the no-bid positions at issue because they involved periodic heavy lifting. Since we are deciding this case on the basis of Dunderdale’s failure to show that a vacant position existed, we will not address whether he was qualified for the no-bid positions.